# EXHIBIT
# B

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                1

1           IN THE CIRCUIT COURT OF

2           CHILTON COUNTY, ALABAMA

3                                           

4    MARGARET N. MARTIN,

5           Plaintiff,

6

7           vs.                    CIVIL ACTION #:
                                    CV 05-336-B
8

9    WAYNE MYRICK and
     LYNN MYRICK,
10
            Defendants.
11

12

13

14

15           DEPOSITION OF LYNN MYRICK

16

17        The Deposition of **LYNN MYRICK** was

18   taken before Lori E. Defnall, Notary

19   Public, on Monday, February 5, 2007, at

20   Natter & Fulmer, PC, Birmingham,

21   Alabama, commencing at 10:17 a.m.,

22   pursuant to the stipulations set forth

23   herein:

24

25

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1    to Oak Mountain Racing?

2         A.    No.

3         Q.    Do you and your husband file

4    joint tax returns?

5         A.    Yes.                                    10:26:52A

6         Q.    Okay.  Has it always been that

7    way since you've been married?

8         A.    Yes.

9         Q.    Okay.  What's your relation to

10    the plaintiff, Margaret Martin?          10:27:08A

11         A.    She's my aunt.

12         Q.    Okay.  Is she your mother's

13    sister or your father's?

14         A.    My father's sister.

15         Q.    Okay.  And my understanding is   10:27:26A

16    that Margaret has lived with you and your

17    husband for some time period during the

18    last five years, correct?

19         A.    Yes.

20         Q.    Okay.  What addresses -- where   10:27:48A

21    were y'all living at the time, when

22    Margaret was living with you?

23         A.    It was on Lake Crest Drive in

24    Hoover.

25         Q.    Okay.  And subsequently, the     10:28:00A

```
 1     lake residence in Verbena?

 2          A.    Yes.

 3          Q.    Okay.  Can you give me a brief

 4     explanation of the circumstances

 5     surrounding how Margaret came to live with      10:28:18A

 6     you and your husband?

 7          A.    Like what?

 8          Q.    What was the purpose for her

 9     coming to live with you?

10          A.    She could not live alone.           10:28:28A

11          Q.    Okay.  Do you remember the

12     dates when she lived with you, when she

13     first started residing with you, and then

14     the date that she stopped residing with

15     you?                                            10:28:48A

16          A.    I think she -- like January of

17     '03 up to June of '04.

18          Q.    How old was Margaret when she

19     came to live with y'all?

20          A.    I want to say 85, but I'm not        10:29:08A

21     sure.

22          Q.    Okay.  What was the condition

23     of her health at that time?

24          A.    Not very good.

25          Q.    Had she previously had a             10:29:30A
```

```
 1     stroke?
 2            A.     Yes.
 3            Q.     And when was that?
 4            A.     November of '03.
 5            MR. GRAY:  I think you may be        10:29:46A
 6     mistaken on that.
 7            Q.     Yeah.
 8            A.     Is it '02?
 9            MR. GRAY:  I believe she came
10     to live with you in January of'03.          10:29:50A
11            A.     Okay.  November of '02, sorry.
12            Q.     Okay.  Had she been advised by
13     any doctor or any other health care
14     provider that she could not live alone?
15            A.     Yes.                           10:30:08A
16            Q.     And who was that?
17            A.     Her doctor.
18            Q.     Do you remember his name or her
19     name?
20            A.     Dodson.                        10:30:12A
21            Q.     Do you know where he practices?
22            A.     Montclair.
23            Q.     Okay.  What exactly did Dr.
24     Dodson advise concerning Margaret's
25     inability to live alone?                     10:30:36A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    20

1          A.    Just that her health would not

2    let her and she had no equilibrium.

3          Q.    Did you have any conversations

4    with Dr. Dodson yourself?

5          A.    Yes.                                    10:30:54A

6          Q.    Okay.  Was there any agreement

7    between Margaret and you, or your husband,

8    concerning her living arrangements, when

9    she came to live with you?

10         A.    Like what kind of?                      10:31:14A

11         Q.    Financially, anything?

12         A.    Just that she would, on the

13   sale of her house, she would give us that

14   to build out the downstairs for her.

15         Q.    Was that agreement ever put            10:31:32A

16   into writing?

17         A.    No.

18         Q.    Did Margaret ever pay any rent?

19               MR. GRAY:  Well, there is

20   document that references it.                        10:31:58A

21               MR. SCHOEL:  References it?

22   Okay.  Are you talking about the Will in

23   that clause?

24               MR. GRAY:  Yeah.

25               MR. SCHOEL:  But I mean, I'm            10:32:04A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

```
1        Number Three was marked for
2        identification.)
3
4          Can you identify those first
5     two checks on that document?                    10:35:50A
6        A.    (Witness reviewing document.)
7     Yes.
8        Q.    Okay.  Specifically, let's look
9     at check number 345.  Who wrote and signed
10    that check?                                      10:36:06A
11       A.    I did.
12       Q.    Okay.  Is that your signature?
13       A.    Yes.
14       Q.    Okay.  What's the date of that
15    check?                                           10:36:10A
16       A.    January the 9th of '04.
17       Q.    Okay.  What's the amount of the
18    check?
19       A.    25 hundred.
20       Q.    Okay.  Does that check             10:36:20A
21    represent part of the five thousand dollar
22    contribution that we were just discussing?
23       A.    Yes.
24       Q.    Okay.  Why didn't Margaret
25    write or sign that check?                        10:36:34A
```

```
 1              A.    I don't know.

 2              Q.    And do you know why the check

 3       was made out to "cash"?

 4              A.    No.

 5              Q.    All right.  Let's look at check    10:36:48A

 6       number 346, right below the one we were

 7       just referencing.  Now again, did you

 8       write and sign that check?

 9              A.    (Witness reviewing document.)

10       Yes.                                            10:37:06A

11              Q.    Okay.  And what's the date of

12       that check?

13              A.    January 14th, '03.

14              Q.    Okay.  And again, the amount is

15       $2,500, right?                                  10:37:14A

16              A.    Yes.

17              Q.    Okay.  Was that check also part

18       of the five thousand dollar contribution

19       that we were just discussing?

20              A.    Yes.                               10:37:24A

21              Q.    Okay.

22              MR. GRAY:  Let me just point

23       out for the record that I suspect that

24       that date may be an error, 1/14/03.  I

25       suspect it was supposed to be '04,            10:37:34A
```

301 Title Building/300 21st Street North
Birmingham, Alabama   35203

```
1                    MR. GRAY:  Let me get that

2         date.  Was it April?

3              Q.    It was sometime in there, but

4         might be the end of the first quarter of

5         2003.  Where was her home located?                   11:12:50A

6              A.    I think it's 58th Place in

7         Crestwood.

8              Q.    And how long had she lived

9         there?

10             A.    I'm not really sure.                       11:13:06A

11             Q.    Okay.  Do you recall how much

12        money she received, net, from the sale of

13        her home?

14             A.    It was around 114 thousand.

15             Q.    Okay.  Does $114,484.62 sound            11:13:30A

16        correct?

17             A.    I guess.

18             Q.    I think I got that figure from

19        either your's or Mr. Myrick's responses to

20        interrogatories.  And you had an agreement         11:13:52A

21        with Margaret to where any net proceeds

22        she received from the sale of her house

23        would be used in the completion of your

24        lake house, right, to build her living

25        space; is that correct?                             11:14:18A
```

```
 1                 MR. GRAY:  Object to the form.
 2          A.    Yes.
 3          Q.    How was that 114 thousand
 4   dollars -- I'm just going to use 114 as a
 5   round figure.  How was that money obtained      11:14:32A
 6   from Margaret?
 7          A.    In a check.
 8          Q.    Okay.  Did she write you a
 9   check, you or your husband, a check?
10          A.    No.                                11:14:42A
11          Q.    How was that check paid?
12          A.    From closing.
13          Q.    Okay.  It was just made out to
14   y'all?
15          A.    No.  Made out to her and           11:14:50A
16   endorsed it.
17          Q.    She endorsed it over?  Was she
18   aware that that entire 114 thousand
19   dollars was going to be used --
20          A.    Yes.                               11:15:12A
21          Q.    -- in the building of her
22   living space?
23          A.    Yes.
24          Q.    Where was that money put once
25   she endorsed the check over to you?            11:15:36A
```

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

```
1              A.    In a building account.

2              Q.    And what was the -- where was

3    that account held?

4              A.    First Commercial Bank.

5              Q.    And was that account held          11:15:48A

6    jointly by you and your husband?

7              A.    Yes.

8              Q.    Okay.  And all of the proceeds,

9    all of the 114 thousand dollars, was put

10   into that account?                                 11:16:02A

11             A.    Yes.

12             Q.    Okay.  And were all of those

13   proceeds eventually used in the

14   construction of your lake house?

15             A.    Yes.                                11:16:14A

16             Q.    Okay.  Now I want to revisit

17   this arrangement or agreement you had with

18   Margaret, concerning her living with you

19   and the funds that would be provided to

20   you to build out her living space.  Could         11:16:40A

21   you describe that agreement for me, just

22   your recollection of what the agreement

23   was?

24             A.    Just that whatever she got out

25   of the sale of her house, she would give          11:16:50A
```

```
 1        it to us to build out the downstairs.

 2             Q.    Okay.  At that point, had y'all

 3        received any estimates as to how much it

 4        would cost to build out her living space?

 5             A.    No.                                      11:17:12A

 6             Q.    Okay.  Did you have any idea,

 7        at that time, how much was going to be

 8        required to build her living space?

 9             A.    I didn't.

10             Q.    Okay.  But the entire 114            11:17:22A

11        thousand was, none the less, put into the

12        building account, correct?

13             A.    Yes.

14             Q.    Okay.  Was the 114 thousand

15        dollars a loan?                                     11:17:40A

16             A.    No.

17             Q.    Okay.  Do you consider it to

18        have been compensation?

19             A.    No.

20             Q.    Okay.  Was it a gift?               11:17:50A

21             A.    Yes.

22             Q.    I'm sorry, if I'm repetitive,

23        did y'all actually wind up using that

24        entire 114 thousand dollars in the

25        building out of her living space?              11:18:12A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          55

```
1              A.    Yes.

2              Q.    There's no funds left over?

3              A.    No.

4              Q.    Okay.  Did you ever provide an

5      accounting of the use of those funds to        11:18:24A

6      Margaret?

7              A.    No.

8              Q.    Were you her Attorney In Fact

9      during the time that these proceeds were

10     spent on the construction of the lake          11:18:38A

11     house?

12             A.    Can you repeat that?

13             Q.    Were you her Attorney In Fact,

14     under the Power of Attorney, that she

15     executed in your favor, at that time?          11:18:48A

16             A.    No.

17             Q.    When was the Power of Attorney

18     executed?

19             A.    I don't think that was until

20     after she moved in with us, or right           11:18:58A

21     before she moved in with us.  I don't

22     remember.  I think it was right after she

23     moved in with us.

24             Q.    Okay.  Let me look.

25                   MR. GRAY:  I think it was -- I    11:19:14A
```

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1        A.    Yes.

2        Q.    Would there be any reason for

3   choosing one account to make payments out

4   of, over the other, or was it just which

5   ever checkbook you picked up?                          11:40:54A

6        A.    Which ever one she wanted to

7   write out of.

8        Q.    Okay.  She would give it to you

9   to write the checks out of?

10       A.    Sometimes.                                   11:41:02A

11       Q.    Okay.  Were there ever any

12  times when you just wrote checks without

13  clearing it with her first?

14       A.    No.

15       Q.    Okay.  Let's change directions      11:41:14A

16  for a minute.  Can you describe Margaret's

17  living quarters for me?

18       A.    Dining room, kitchen, den,

19  nook, a master bedroom with a sitting area

20  and a full bath, two walk-in closets in     11:42:12A

21  her bedroom, guest bedroom with a sitting

22  area, and another full bath.

23       Q.    Were those living quarters

24  constructed specifically for her?

25       A.    Yes.                                         11:42:36A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224

75

```
 1              Q.    Was it constructed during the
 2     same time that the main house was being
 3     constructed, or did it come afterwards?
 4              A.    Do you mean after the main
 5     house was finished?                              11:50:14A
 6              Q.    Yes, ma'am.
 7              A.    No.
 8              Q.    It was while it was being
 9     constructed?
10              A.    Yes.                               11:50:20A
11              Q.    Okay.  So it would have been
12     completed around April 1st, 2004
13     timeframe?
14              A.    Yes.
15              Q.    Okay.  And was it built by        11:50:26A
16     Tatum and Company as well?
17              A.    Yes.
18              Q.    Okay.  Do you know how much it
19     cost to build that detached garage?
20              A.    No.                                11:50:58A
21              Q.    Do you have any idea how much
22     money you received from Margaret towards
23     that endeavor?
24              A.    Yes.
25              Q.    And how much was that?            11:51:14A
```

301 Title Building/300 21st Street North
Birmingham, Alabama   35203

```
1              A.    I think it was around 86.

2              Q.    Thousand?

3              A.    Yes.

4              Q.    How were those funds obtained

5     from Margaret?                                      11:51:24A

6              A.    By a check.

7              Q.    Did she write the check?

8              A.    Yes.

9              Q.    Do you remember which account

10    she wrote it out of?                                11:51:38A

11             A.    I don't think it was a check

12    like this, like out of her account.    I

13    think it was a bank check.

14             Q.    Did it come from the closing

15    out of some sort of CD or other                     11:51:52A

16    investment?

17             A.    Yes.

18             Q.    Okay.  Do you have copies of

19    those records?

20             A.    Yes.                                  11:52:00A

21             Q.    Okay.  Can you provide those to

22    your attorney so he can provide them to

23    me?

24             MR. GRAY:  I think we've given

25    you the documents that we have reflecting           11:52:08A
```

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

```
 1              A.    I don't remember.

 2              Q.    Okay.  Did you actually help

 3       perpetrate that transaction?

 4              A.    No.

 5              Q.    Okay.  You didn't assist in          11:53:20A

 6       closing any accounts or writing any

 7       checks?

 8              A.    No.

 9              Q.    Okay.  Did Margaret have a

10       clear understanding of exactly how much        11:53:38A

11       money was being obtained from her, to

12       build that garage?

13              A.    Yes.

14              Q.    Are there any sort of writings,

15       promissory notes, anything to that affect,     11:53:48A

16       reflecting the details of this agreement?

17              A.    No.

18              Q.    Okay.  It was just an oral

19       agreement?

20              A.    Yes.                                 11:53:58A

21              Q.    Okay.  Now was that 86 thousand

22       dollars and change, that was received from

23       Margaret, used solely to build the garage?

24              A.    No.

25              Q.    Okay.  What else was it used         11:54:10A
```

```
1      expenditures for household furnishings
2      with Margaret's funds?
3              A.    No.
4              Q.    You never did?
5              A.    No.                                  12:27:18P
6              Q.    Did you write the check for the
7      Lazy Boy chair that we referenced earlier?
8              A.    I don't know if I did or not.
9              Q.    Okay.  Was a refrigerator for
10     her living space purchased with her funds?  12:27:36P
11             A.    Yes.
12             Q.    How much was paid for that
13     refrigerator?
14             A.    I don't know.
15             Q.    Do you remember who you bought   12:27:54P
16     it from?
17             A.    It's where ever she went to
18     pick out her dishwasher and all the other
19     appliances, she picked it out there.  It's
20     on Valleydale Road, but I don't remember   12:28:12P
21     the name of the company.
22             Q.    You say Margaret picked it out?
23             A.    Yes.
24             Q.    Why didn't you pick it out?
25             A.    Because it was going to be her   12:28:20P
```

(205) 251-4227 / FAX (205) 251-4224                    103

1  refrigerator, she should pick it out.

2       Q.    So it's hers?

3       A.    Well it was paid for with the

4  money she gave us from the sale of her

5  house to furnish it out.                    12:28:30P

6       Q.    Were the other appliances

7  purchased -- the other appliances in her

8  kitchen area, in her living space, were

9  they purchased with her money?

10      A.    Yes.                              12:28:38P

11      Q.    Okay.  And all the other

12 fixtures that are in that living space

13 were purchased with her money as well,

14 correct?

15      A.    From the sale of her house.      12:28:46P

16      Q.    Okay.  Now Margaret was, what,

17 85, 86 years old at the time?

18      A.    Yes.

19      Q.    And she was allowed to pick out

20 her own fixtures?                            12:29:00P

21      A.    Yes.

22      Q.    She didn't have any assistance

23 from you as far as picking style or color?

24      A.    No.

25      Q.    You went with exactly what       12:29:10P

```
 1          Q.    Or anywhere.  I mean,  if she
 2     purchased something for any other place in
 3     your house?
 4          A.    That she selected?
 5          Q.    That she paid for?                    12:31:20P
 6          A.    What's downstairs in her
 7     apartment.
 8          Q.    Okay.  And she selected all of
 9     those appliances?
10          A.    Yes.                                  12:31:30P
11          Q.    Has Margaret ever requested to
12     remove that refrigerator from your
13     residence?
14          A.    No.
15          Q.    She has not?                          12:31:46P
16          A.    She has not.
17          Q.    Has anybody requested on her
18     behalf to have that refrigerator removed?
19          A.    Yes.
20          Q.    Have you honored that request?       12:31:52P
21          A.    No.
22          Q.    Why not?
23          A.    Because it was paid with the
24     money that she gave us to build out the
25     downstairs for her.                             12:32:00P
```

1    document.  I guess this will be

2    Plaintiff's Exhibit Nine?

3

4         (Whereupon, Plaintiff's Exhibit

5         Number Nine was marked for

6         identification.)

7

8         MR. GRAY:  Correct.

9         Q.    Can you identify that document?

10        A.    (Witness reviewing document.)              12:40:38P

11   It says "Durable Power of Attorney."

12        Q.    Okay.  When was this Power of

13   Attorney executed?

14        A.    (Witness reviewing document.)

15   The date on it's January 2nd, 2003.                   12:40:58P

16        Q.    Okay.  And who prepared it?

17        A.    Paden & Paden.

18        Q.    Okay.  Is that Shan Paden?

19        A.    Yes.

20        Q.    Okay.  And is it true that you    12:41:12P

21   were the Attorney In Fact under this Power

22   of Attorney?

23        A.    Yes.

24        Q.    Okay.  Who initiated the idea

25   of creating a Power of Attorney in your    12:41:38P

```
 1              MR. GRAY:  Object to the form.
 2         Q.    And I'm talking about from
 3    January 2nd, 2003 through June 4th, 2004.
 4         A.    Can you repeat the question?
 5         Q.    Do you admit, that during that      12:55:00P
 6    time, that you were under a fiduciary duty
 7    to Margaret, pursuant --
 8         A.    What does fiduciary mean?
 9         Q.    Do you not know what fiduciary
10    duty means?
11         A.    No.
12         Q.    Do you understand that under
13    the Power of Attorney you did have a duty
14    to Margaret, to act in her best interest?
15         A.    Yes.                                 12:55:22P
16         Q.    What is your understanding of
17    what your duties were to Margaret, under
18    the Power of Attorney?
19         A.    To get her medical help when
20    she needs it and assist her in her            12:56:00P
21    financial stuff when she needs it.
22         Q.    Okay.  Would you agree that you
23    were under a duty to use the powers
24    conferred upon you for Margaret's sole
25    benefit?                                       12:56:14P
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224

REPORTER'S CERTIFICATE

STATE OF ALABAMA   )
JEFFERSON COUNTY   )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing, to the best of my ability and understanding.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

_____
Lori E. Defnall

My Commission expires:
January 22, 2011

301 Title Building/300 21st Street North
Birmingham, Alabama  35203



PLAINTIFF'S
EXHIBIT
9
L. Myrick

STATE OF ALABAMA        )

JEFFERSON COUNTY        )

## DURABLE POWER OF ATTORNEY

I, MARGARET N. MARTIN, of Jefferson County, Alabama, hereby appoint my niece, LYNN W. MYRICK (herein called "my attorney"), a sample of whose signature appears below, my true and lawful agent and attorney-in-fact, for me and in my name to perform any or all of the following acts with reference to any interest from time to time owned by me in property, real or personal, wherever located (herein called "property"), or other matters in which I from time to time may have a personal or financial interest:

1. To deposit in or withdraw from any bank, trust company, savings association, safe deposit company, broker or other depositary or agent any moneys or other property and to examine or receive related records, including statements of account and canceled checks.

2. To rent safe deposit boxes in my name as depositories for my property, and to open and enter on my behalf any safe deposit box rented or held by me alone or jointly with others, at any time to deposit in such box and to remove from such box any part or all of the contents thereof, including any security or tangible personal property, as often and as freely as I could do if personally present, to cancel or modify the lease under which such box is rented and to surrender or exchange the same.

3. To retain, invest in, acquire by purchase, subscription, lease or otherwise, manage, sell at public or private sale, wholly or partly for cash or on credit, contract to purchase or sell, grant or exercise options to purchase, options to sell or conversion rights, assign, transfer, convey, deliver, endorse, exchange, pledge, mortgage, abandon, improve, repair, maintain, insure, lease for any term and otherwise deal with all property, and to release and waive any right of homestead therein, if any.

wp8\shan\forms\poa\martin

1

4.  To enter upon and demand possession of, maintain, manage, improve, subdivide, re-subdivide, raze, alter, dedicate, vacate, partition, release, lease or renew, amend or extend leases for any term, contract to make leases, grant options to lease or to purchase the whole or any part of the reversion, contract regarding the manner of fixing present or future rentals, grant easements or charges of any kind on or with respect to, and cultivate, irrigate and operate, all interests in real estate now or hereafter owned by me, including beneficial interests in any trust and leasehold interests, and related improvements, equipment and supplies, alone or with others, by general or limited partnerships, trust agreements, joint ventures, corporations, associations, sharecrop agreements, leases, management or agency agreements, participation in government programs or otherwise.

5.  To borrow money at interest rates then prevailing from any individual, bank or other source, and mortgage or pledge any property to any lender, including my attorney individually.

6.  To determine my place of residence from time to time, to pay my ordinary household expenses, to arrange for and pay the costs of medical, dental, nursing, hospital, convalescent and other health care and treatment, including admission to hospitals, nursing homes, rest homes or other care facilities or institutions; to consent to treatment, and to make application for insurance, pension or employee benefits related to such health care and treatment, including, but not limited to, benefits under Social Security, Medicare and Medicaid; to obtain on my behalf copies of medical reports, summaries or other related information concerning me made or taken before or after the date of this instrument, including, but not limited to, records and/or communications, and to execute any written consents on my behalf for the disclosure of such records and communications under any provisions or act, referred to or defined by federal statute, statutes of any state of the United States or ordinances, rules or requirements of any local governmental municipality, authority or agency.

7.  To demand, sue for, receive and otherwise take steps to collect or recover all debts, rents, proceeds, interest, dividends, annuities, securities for money, goods, chattels, bequests, income from property, damages and all other property to which I may be entitled or which are or may become due me from any person or organization; to commence, prosecute or enforce, or to defend, answer or oppose, contest and abandon all legal proceedings in which I am or may hereafter be interested; and to settle, compromise or submit to arbitration any accounts, debts, claims, disputes and matters now existing or which may hereafter arise between me and any other person or organization and to grant an extension of time for the payment or satisfaction thereof on any terms, with or without security.

8.  To continue to carry, purchase, cancel or dispose of fire, casualty,

property or income protection, medical, hospital, life, liability or other insurance and to pay any premiums thereon.

9. To sell and dispose of, as my attorney shall deem best, by private sale or otherwise, any shares of stock I now hold or may hereafter hold in any corporation, and any bonds or securities of the United States, any state, or any municipal corporations or private company, and to receive the consideration from the sale thereof, and for me and in my name to execute such transfers or assignments as shall be necessary to assign my said shares, bonds or securities to the purchaser or purchasers, and to pay any and all reasonable charges in connection with the handling of my securities.

10. To exercise in person or by general or limited proxy all voting and other rights, powers and privileges and to take all steps to realize all benefits with respect to stocks or other securities including the power to enter into or oppose, alone or with others, voting trusts, mergers, consolidations, foreclosures, liquidations, reorganizations or other changes in the financial structure of any corporation.

11. To retain, continue, operate, manage, organize, acquire, invest in, terminate and dispose of, alone or with others, proprietorships, corporations, limited or general partnerships, joint ventures, land trusts and other business or property holding organizations under the laws of any jurisdiction; to lease, sell, purchase or otherwise transfer any property to or from, make further investments in or advance or loan funds to, with or without security, and incur obligations on account of or for the benefit of, any such organization; and to employ any persons for such purposes and delegate to them such powers and discretions as my attorney considers advisable.

12. To undertake performance of any and all acts, whether or not otherwise specifically enumerated herein, including the sale of any property or the borrowing of any funds, which my attorney considers necessary or appropriate in order to purchase United States Treasury Bonds redeemable at par in payment of federal estate taxes; provided, however, that nothing herein shall be construed as requiring my attorney to acquire any such bonds.

13. To appear and represent me in regard to and to take all actions convenient or appropriate in connection with taxes imposed by any municipal, state, United States or foreign authority or government relating to any tax liability or refund, abatement or credit (including interest or penalties) due or alleged to be due from or to me or any other person or organization, association or trust for which I am responsible for the preparation, signing, executing, verifying, acknowledging or paying of any tax due or filing of a return or report, including without limitation federal or state income or gift tax, for the year 1981 and all subsequent years; and for such purposes to inspect or receive copies of any tax returns filed by or for me,

reports, or other papers or documents, compromises, or adjustments of any and all claims, and to execute Internal Revenue Service Forms 2848 and 2848-D, and any other forms required by the Internal Revenue Service or any other governmental agency from time to time in regard to the granting of powers of attorney, and to name my attorney or any other person as my attorney thereunder.

14. To prepare, draw, make, sign, execute, seal, acknowledge, verify, discount, accept, endorse, with or without recourse on me, waive demand, notice and notice of protest, file and deliver on my behalf, any and all checks, options, orders, notes, drafts, overdrafts, certificates of deposit, bills of exchange, deeds, directions to land trustees, mortgages, leases, powers of sale, bonds (of indemnity or otherwise) and contracts, transfers, assignments, proxies, agreements, receipts, releases, release deeds, composition agreements, discharges, income or personal or intangible property or gift or other tax returns, estimates, declarations, certificates, schedules, statements, claims of abatement, refund or credit, protests, requests, (including requests for rulings from proper authorities), applications, waivers (including waiver of restrictions on the assessment or collection of any deficiency or additional tax), acceptances (including acceptance of any determination or proposed determination of additional tax or over assessment or overpayment of tax, including interest and penalties), consents or waivers or agreements for a later determination and assessment and collection of taxes than is provided by applicable statutes of limitations, closing agreements (whether in respect of a tax liability or a specific matter or otherwise), petitions, pleadings, motions, stipulations, consents and any other papers, documents or writings or things, with or without guarantees, surety obligations, covenants, warranties, indemnifications, representations, powers of substitution, affirmations or otherwise.

15. To appoint and employ, with or without compensation, any accountants, attorneys at law, investment counsel, agents, servants or other persons, including their agents and associates, and to dismiss or discharge the same and to appoint or employ any others in their stead as my true and lawful attorneys, to appear and represent me as to all matters covered by this power of attorney, or for any other purpose, including, but not limited to, appearances before the Treasury Department of the United States, the Tax Court of the United States, the United States Court of Claims, or any other court of the United States or the District of Columbia, or any state, municipal or foreign court, and any department or official of the United States government or any state, municipal or foreign government; with full power and authority to such agents and attorneys to do any and all acts convenient or appropriate in connection with such matters, including the specific acts described above, and to substitute attorneys and agents subsequent to the date of such appointment and prior to any revocation thereof, and to delegate and revoke the authority so granted to them.

16.  To pay, as my attorney shall think fit, any debts or interest payable by me, or taxes, assessments and expenses due and payable or to become due and payable for my use and benefit or for the use and benefit of any person whom I have a legal obligation to support.

17.  To transfer, assign and convey any property or interest in property which I may own to any trust of which I am a beneficiary and under the terms of which I expressly have the power, exercisable alone or with others, to amend or revoke such trust, whether such trust was created before or after the execution of this power of attorney.

18.  To pay my pledges to and make such gifts as I have regularly made to charitable organizations described in Section 170(c) of the Internal Revenue Code or corresponding provisions of any subsequent federal tax laws ("Code") and to make gifts to persons, including any attorney acting hereunder, or for their benefit, which qualify for the federal gift tax annual exclusion, described in Section 2503(b) of the Code.

19.  To (i) conduct environmental assessments, audits, and site monitoring to determine compliance with any environmental law or regulation thereunder; (ii) take all appropriate remedial action to contain, clean up or remove any environmental hazard including a spill, release, discharge or contamination, either on its own accord or in response to an actual or threatened violation of any environmental law or regulation thereunder; (iii) institute legal proceedings concerning environmental hazards or contest or settle legal proceedings brought by any local, state, or federal agency concerned with environmental compliance, or by a private litigant; (iv) comply with any local, state or federal agency order or court order directing an assessment, abatement or cleanup of any environmental hazards; and (v) employ agents, consultants and legal counsel to assist or perform the above undertakings or actions.

20.  Finally (without prejudice to and in enlargement of the authority above conferred) to execute each and every instrument, undertake each and every obligation, and to take from time to time any and all action of whatsoever nature and with relation to any matters whatsoever, whether or not specifically mentioned herein, and to exercise in respect thereto as full and complete power and discretion as I myself might or could do.

The powers and authorities granted herein shall not be affected, impaired or exhausted by any non-exercise thereof or by any one or more exercises

thereof. My attorney shall exercise or fail to exercise the powers and authorities granted herein in each case as my attorney, in my attorney's own absolute discretion, deems desirable or appropriate under existing circumstances. I hereby ratify and confirm as good and effectual, at law or in equity, all that my attorney, and any agents and attorneys appointed by my attorney, and their agents, associates and substitutes, may do by virtue hereof. However, despite the above provisions, nothing herein shall be construed as imposing a duty on my attorney to act or assume responsibility for any matters referred to above or other matters, even though my attorney may have power or authority hereunder to do so.

If any power or authority hereby sought to be conferred upon my attorney should be invalid or unexercisable for any cause or not recognized by any person or organization dealing with my attorney, the remaining powers and authorities given to my attorney hereunder shall nevertheless continue in full force and effect.

This power of attorney shall remain in full force and effect and shall not be affected by disability, incompetency, or incapacity of the principal, it being my intent that the power granted herein shall continue without interruption until my death unless previously revoked by me or as otherwise provided by law. Any person dealing with my attorney may rely without inquiry upon his certification that this power of attorney has not been revoked.

I expressly agree that all acts done hereunder in good faith by my attorney, prior to the receipt by my attorney or by any party with whom my attorney

wp8\shan\forms\poa\martin                6

has dealt pursuant to this power of attorney of actual notice of revocation of this authority, whether by my death or otherwise, shall be binding upon me and upon my heirs and legal representatives.

No person relying upon this power of attorney in good faith and without actual notice of revocation of this authority shall incur any liability to me or my estate as a result of permitting my attorney to exercise any power or discretion on my behalf granted herein, nor shall any person dealing with my attorney be required to see to the application and disposition of any moneys, stocks, bonds, securities or other property paid to or delivered to my attorney, or my attorney's substitute, pursuant to the provisions hereof.

This power of attorney shall be governed by the laws of the State of Alabama and shall be effective from and after the date of execution hereof.

Reproductions of this executed original (with reproduced signatures and the certificate f acknowledgment) shall be deemed to be original counterparts of this power of attorney.


Specimen signature of my attorney:


Lynn W. Myrick


wp8\shan\forms\poa\martin                    7

In Witness Whereof, I hereby certify to the genuineness of the signature of my attorney and have signed this power of attorney this _2 nd_ day of _January_, 20 _0 3_.

_Margaret N. Martin_
Margaret N. Martin

STATE OF ALABAMA          )
                          )     SS
_Shelby_ COUNTY           )

    I, _Kim M. Foster_, a notary public in and for said County and State, hereby certify that MARGARET N. MARTIN, whose name is signed to the foregoing power of attorney, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same voluntarily on the day the same bears date.

    Given under my hand this _2 nd_ day of _January_,

A.D. 20 _0 3_.

_Kim M. Foster_
Notary Public

My Commission Expires:  _9-4-06_

This instrument was prepared by:

R. Shan Paden
PADEN & PADEN
Attorneys at Law
5 Riverchase Ridge, Suite 100
Birmingham, AL 35244
205-987-7210

wp8\shan\forms\poa\martin



PLAINTIFF'S
EXHIBIT
12
L. Myrick



COPY

## LAST WILL AND TESTAMENT

### OF

### MARGARET N. MARTIN

I, Margaret N. Martin, of Jefferson County, Alabama, declare this to be my will, and I revoke all prior wills and codicils that I have made.

### ARTICLE I

All estate and inheritance taxes (including interest and penalties, if any), together with the expenses of my last illness and all administration expenses, including an appropriate marker for my grave, payable in any jurisdiction by reason of my death (including those taxes and expenses payable with respect to assets which do not pass under this will) shall be paid out of and charged generally against the principal of my residuary estate, without apportionment. I waive any right of reimbursement for, recovery of, or contribution toward the payment of those taxes and administration expenses, except my executors shall, to the maximum extent permitted by law, seek reimbursement for, recovery of, or contribution toward the payment of federal or state estate tax attributable to property in which I have a qualifying income interest for life, over which I have a power of appointment, or which is included in my gross estate by reason of Section 2036 of the Internal Revenue Code of 1986, as from time to time amended ("Code"), and which tax is not otherwise paid or payable. Any generation-skipping tax resulting from a transfer occurring under this will shall be charged to the property constituting the transfer in the manner provided by applicable law.

### ARTICLE II

A.     I give my diamond tennis bracelet, diamond watch, Precious Moments Collection, curio cabinet and my diamond gold band wedding ring to my great-niece Amanda Myrick, if living on the thirtieth day after the date of my death.

B.    I give my diamond necklace, gold stone earrings and necklace to my granddaughter, Kim Barfield, if living on the thirtieth day after the date of my death.

C.    I give my gold stone ring to my great-granddaughter Katelyn Barfield, if living on the thirtieth day after the date of my death.

D.    I give Aunt Inez's silver and diamond wedding ring to my niece Lynn Myrick, if living on the thirtieth day after the date of my death.

E.    I give all the furniture and furnishings that I own that are located in Wayne and Lynn Myrick's house at the time of my death, to Lynn and Wayne Myrick or the survivor of Lynn and Wayne, if living on the thirtieth day after the date of my death.

F.    I give Uncle Bill's desk to Janice Armstrong, if living on the thirtieth day after the date of my death.

G.    I give my son, Thomas J. McClung, three (3) Tiffany lamps, if living on the thirtieth day after the date of my death.

H.    I give all the rest of the tangible personal property that I own at my death, books, pictures, jewelry, art objects, hobby equipment and collections, wearing apparel, and other articles of household or personal use or ornament, together with any insurance on any specific item, to my son, Thomas J. McClung, and niece, Lynn Myrick, in shares of substantially equal value, to be divided in such manner as they shall agree or, if they shall fail to agree upon a division within six months after the date of my death, as my executor shall determine.

I.    If a beneficiary under this Article has not reached legal age under the law of the jurisdiction in which the child is domiciled at the time set for distribution under this Article, then the person having legal custody of the beneficiary (i) shall represent the beneficiary in any division of the property, (ii) may give a binding receipt for and hold the beneficiary's share for his or her benefit, (iii) may sell any part or all of the share, and (iv) shall deliver the share or sale proceeds to the beneficiary before or when the beneficiary reaches legal age, all as that person considers advisable.

-2-

J.    All costs of safeguarding, insuring, packing, and storing my tangible personal property before its distribution and of delivering each item to the place of residence of the beneficiary of that item shall be deemed to be expenses of administration of my estate.

K.    I give to Wayne and Lynn Myrick all interests not otherwise effectively disposed of which I have at my death (whether as owner, lessee, shareholder, trust beneficiary, or otherwise) in property occupied at my death by me as my principal residence. At the time of the execution of this will my principal residence is located at 1013 South 58th Street, Birmingham, AL 35222. I have executed a contract to sell my residence and it is my intent to use the proceeds from the sale to finish the basement in Wayne and Lynn's home at Lake Mitchell, Chilton County, Alabama,  to become my principal residence. I will hold no legal title or interest in Wayne and Lynn's home and Wayne and Lynn shall not be indebted to my estate in any manner whatsoever for the money spent by me in finishing their basement.

## ARTICLE III

I give all my residuary estate, which shall not include any property over which I have power of appointment, to my son, Thomas J. McClung, and niece, Lynn Myrick, in shares of substantially equal value, to be divided in such manner as they shall agree or, if they shall fail to agree upon a division within six months after the date of my death, as my executor shall determine.

## ARTICLE IV

A. I name Lynn Myrick as executrix of this will.  If Lynn fails or ceases to act as executrix of this will for any reason, then I appoint her husband, Wayne Myrick, to be my successor executor. No executor of this will shall be required to furnish bond or other security as executor.

B. If the appointment of an executor of my estate is necessary or desirable in any jurisdiction in which no executor herein named is able and willing to act, I appoint as my executor in that jurisdiction such person or corporation as may be designated in an

-3-

instrument signed by my executor, that executor to serve without bond, or if bond is required, without surety thereon, and to have all the powers and discretion with respect to my estate in that jurisdiction that are set forth or referred to in paragraph C of this Article, to be exercised without court order. As used in this will, the terms "executors" and "executor" designate any court-appointed fiduciaries or fiduciary of my estate from time to time qualified and acting in any jurisdiction.

C. In addition to all powers granted by law, I give my executors power, exercisable in the discretion of my executors and without court order, to retain, sell (at public or private sale), exchange, lease for any term (even though commencing in the future or extending beyond the date of final distribution of my estate), mortgage, pledge, or otherwise deal for any purpose with the property, real or personal, from time to time comprising my estate, for such consideration and on such terms (with or without security) as my executors shall determine; to invest and reinvest my estate and proceeds of sale of any portion thereof in such loans, stocks, or other securities, mortgages, investment companies or trusts, whether of the open and/or closed fund types, interests in general, limited or special partnerships, common trust funds, or other property as they may consider suitable, whether or not a so-called "legal" investment of trust funds, and to change investments and to make new investments from time to time as to my executors may seem necessary or desirable; to borrow money for any purpose, at interest rates then prevailing, from any individual, bank, or other source, irrespective of whether that lender is then acting as an executor; to compromise or abandon any claims in favor of or against my estate; to hold any property in the name of a nominee or in bearer form; to employ accountants, depositaries, attorneys, and agents (with or without discretionary powers); to execute contracts, notes, conveyances, and other instruments, including instruments containing covenants and warranties binding upon and creating a charge against my estate, and containing provisions excluding personal liability; to make distributions wholly in cash or in kind, or partly in each; to allot different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries; and to determine the value of any property distributed in kind.

-4-

D. I empower my executors (i) to make such elections under the tax laws as my executors deem advisable, including an election to create qualified terminable interest property for both estate and generation-skipping tax purposes or for estate tax purposes alone, and (ii) to allocate the unused portion, if any, of my GST exemption (as defined in this paragraph) to any property with respect to which I am the transferor for generation-skipping tax purposes (irrespective of whether such property passes under this will) in such manner as my executors deem advisable, in each case without regard to the relative interests of the beneficiaries; however, my executors shall not make adjustments between principal and income, or in the interests of the beneficiaries, to compensate for the effects of such elections and allocation. Any decision made by my executors with respect to the exercise of any tax election or the allocation of my GST exemption shall be binding and conclusive on all persons. As used in this paragraph, the "GST exemption" means the exemption from generation-skipping tax allowed under Section 2631 of the Code.

E. I direct that the compensation of the corporate executor shall be in accordance with its published schedule of fees as in effect at the time the services are rendered.

F. To the extent that such requirements can be legally waived, no executor shall be required to file an inventory or appraisal, or account to any court, or obtain the order or approval of any court before exercising any power or discretion granted in this will.

G. I also give my executors power, exercisable in the discretion of my executors and without court order, to (i) conduct environmental assessments, audits, and site monitoring to determine compliance with any environmental law or regulation thereunder; (ii) take all appropriate remedial action to contain, clean up or remove any environmental hazard including a spill, release, discharge or contamination, either on its own accord or in response to an actual or threatened violation of any environmental law or regulation thereunder; (iii) institute legal proceedings concerning environmental hazards or contest or settle legal proceedings brought by any local, state, or federal agency concerned with environmental compliance, or by a private litigant; (iv) comply with any local, state or federal agency order or court order directing an assessment, abatement or cleanup of any

-5-

environmental hazards; and (v) employ agents, consultants and legal counsel to assist or perform the above undertakings or actions.

H.  No executor shall be liable for any loss or depreciation in value sustained by the estate as a result of the executors retaining any property upon which there is later discovered to be hazardous materials or substances requiring remedial action pursuant to any federal, state, or local environmental law, unless the executors contributed to the loss or depreciation in value through willful default, willful misconduct, or gross negligence.

I.  To the maximum extent permitted by law, the executor may withhold a distribution to a beneficiary hereunder until receiving from the beneficiary an indemnification agreement in which the beneficiary agrees to indemnify the executor against any claims filed against the executor as an "owner" or "operator" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as from time to time amended, or any regulation thereunder; provided further that the executor may not take any action under this paragraph which would in any way jeopardize any marital deduction available under federal or state law for property passing to or for the benefit of my spouse.


## ARTICLE VI

For purposes of determining who is a descendant of mine or of any other person:

A. Legal adoption before the person adopted reached the age of twenty-one years shall be the equivalent in all respects to blood relationship; and

B.  A person born out of wedlock and those claiming through that person shall be deemed to be descendants (i) of the natural mother and her ancestors, and (ii) if the natural father acknowledges paternity, of the natural father and his ancestors, in each case unless a decree of adoption terminates such natural parent's parental rights.

-6-

I signed this will on *March 25th*, 2003.

*Margaret N. Martin*
Margaret N. Martin

    On the date last above written, we saw Margaret N. Martin, in our presence, sign the foregoing instrument at its end. She then declared it to be her will and requested us to act as witnesses to it. We then, in her presence and in the presence of each other, signed our names as attesting witnesses, believing her at all times herein mentioned to be of sound mind and memory and not acting under constraint of any kind.

*Angie Phillips*

Residing at ___ 101 Rosewood Circle ___
___ Calera, AL 35040 ___

*Tricia Paden*

Residing at ___ 534 Oakline Dr. ___
___ Hoover, AL 35226 ___

    I, Margaret N. Martin, the testatrix, sign my name to this instrument this 25th day of March, 2003, and being first duly sworn, do hereby declare to the undersigned authority that I sign and execute this instrument as my last will and that I sign it willingly (or willingly direct another to sign for me), that I execute it as my free and voluntary act for the purposes therein expressed, and that I am eighteen years of age or older, of sound mind, and under no constraint or undue influence.

*Margaret N Martin*
Margaret N. Martin

We, *Angie Phillips* and *Tricia Paden*, the witnesses, sign our names to this instrument, being first duly sworn, and do hereby declare to the undersigned authority that the testatrix signs and executes this instrument as her last

-7-

will and that she signs it willingly (or willingly directs another to sign for her), and that each

of us, in the presence and hearing of the testatrix, hereby signs this will as witness to the

testatrix's signing, and that to the best of our knowledge the testatrix is eighteen years of

age or older, of sound mind, and under no constraint or undue influence.

_____
Witness

_____
Witness

STATE OF ALABAMA          )
                          )     SS
COUNTY OF SHELBY          )

Subscribed, sworn to and acknowledged before me by _____

the testatrix, and subscribed and sworn to before me by _____, and

_____, witnesses, this 25th day of March, 2003.

SEAL                      (Signed) _____

                          _____
                          Notary Public

-8-