# EXHIBIT
# C

1           IN THE CIRCUIT COURT OF

2           CHILTON COUNTY, ALABAMA

3                                    COPY

4    MARGARET N. MARTIN,

5

6           Plaintiff,

7    vs.                    CIVIL ACTION #:
                            CV 05-336-B
8

9    WAYNE MYRICK and
     LYNN MYRICK,
10
            Defendants.
11

12

13

14

15        DEPOSITION OF WAYNE MYRICK

16

17        The Deposition of **WAYNE MYRICK** was

18   taken before Lori E. Defnall, Notary

19   Public, on Monday, February 5, 2007, at

20   Natter & Fulmer, PC, Birmingham,

21   Alabama, commencing at 2:17 p.m.,

22   pursuant to the stipulations set forth

23   herein:

24

25

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1    have been the first part of '03, last part
2    of '02.
3          Q.    Okay.  And prior to that she
4    had suffered a stroke; is that correct?
5          A.    Yes.  I believe that was what          02:32:32P
6    her medical problem was.
7          Q.    And that was the primary reason
8    why she came to live with you?
9          A.    I think that had something to
10   do with it.                                         02:32:42P
11         Q.    Okay.  Were there any other
12   reasons why she came to live with you?
13         A.    Not that I'm aware of, other
14   than just her doctor recommended that she
15   not live alone.                                     02:32:52P
16         Q.    Okay.  She was about 86 years
17   old at the time?
18         A.    That's close -- yeah.  About
19   that.
20         Q.    Can you describe the                    02:33:00P
21   arrangement that you and your wife had
22   with Margaret, concerning her living
23   arrangement at your house?
24         A.    Well, the arrangement was that
25   she would be able to live with us until            02:33:36P

1    she could no longer be taken care of

2    without medical assistance or other

3    assistance that we wouldn't be able to

4    provide from a professional standpoint.

5    And in exchange for that, and building out          02:33:50P

6    the lower portion of the space for her,

7    that she would give us the equity from her

8    home as compensation for those two things.

9         Q.    Okay. So, you consider the

10   equity that you received from the sale of           02:34:12P

11   her house to be compensation for her being

12   allowed to come live with you?

13        A.    Yes.  That was the agreement

14   that we had.  I'm not sure compensation is

15   the right word, but it was the arrangement          02:34:30P

16   we had.

17        Q.    Other than the clause in

18   Margaret's 2003 Will, where she addresses

19   this arrangement, are you aware of any

20   other written agreement, which encompasses          02:34:52P

21   the details of this living arrangement?

22        A.    No.

23        Q.    In addition to the equity from

24   her home, which was 114 thousand dollars

25   and change, did Margaret ever pay you rent         02:35:22P

```
 1    with us as something she could do.  I
 2    think, if she couldn't live by herself,
 3    she'd probably not need to be driving by
 4    herself.
 5         Q.    All right.  When did Margaret's       02:40:02P
 6    house sell?
 7         A.    It would have been sometime in
 8    the first quarter of '03.  I'm not sure
 9    exactly of the dates.
10         Q.    Okay.  And the net proceeds           02:40:24P
11    from the sale of that house was a little
12    over 114 thousand dollars; is that
13    correct?
14         A.    I believe that's correct.
15         Q.    And you and your wife actually        02:40:34P
16    were the ultimate recipients of that 114
17    thousand dollars; is that correct?
18         A.    That's correct.
19         Q.    Okay.  And was her version of
20    how y'all obtained that 114 thousand         02:40:52P
21    dollars accurate - the check at the
22    closing was just endorsed over?
23         A.    Seems like that was --
24         Q.    To one or both of you?
25         A.    Yeah, I'm not sure, but I think       02:41:02P
```

1    that's probably how it happened.

2        Q.    Okay.  Was that 114 thousand

3    dollars taken straight to the construction

4    account?

5        A.    Yes.  It was deposited into our    02:41:10P

6    construction account at First Commercial,

7    I believe.

8        Q.    All right.  Okay.  How was that

9    114 thousand dollars used?

10        A.    It went into our construction    02:41:42P

11    account and ultimately was used in some of

12    the building of our residence that we

13    shared with Aunt Margaret.

14        Q.    And can you give me some

15    specific expenditures that it was used on,    02:41:56P

16    as far as what was purchased or the

17    construction services that were paid for?

18        A.    Well we had a contract with a

19    building contractor.  And our agreement

20    was a cost-plus arrangement.  And so, when    02:42:10P

21    we had the -- when we finalized the

22    agreement, we agreed with her to come live

23    with us, then we instructed him to build

24    out the basement according to the way she

25    wanted it.    02:42:20P

1  believe, it was approximately, our initial

2  budget was originally like 650 thousand.

3  But we didn't really use that in our

4  contract.  This was somebody that came

5  highly recommended to me, somebody that I          02:44:28P

6  was somewhat familiar with.  And so, we

7  entered a cost-plus arrangement to do the

8  work, rather than a stipulated sum, or

9  even a guarantee maximum price amount for

10  something.                                         02:44:42P

11       Q.    Sure.  Well, I assume, that

12  part of the construction was financed,

13  correct?

14       A.    Yes.

15       Q.    Okay.  Did the bank require any        02:44:48P

16  sort of estimate from the builder?

17       A.    No.

18       Q.    Did not?  Okay.  Was any sort

19  of addendum to the original agreement, or

20  contract with your builder, prepared after       02:45:00P

21  it was decided that Margaret would come

22  live with you, and you would need to build

23  out the downstairs place?

24       A.    No.  We just simply told them

25  verbally what we wanted to do.  We -- I           02:45:12

1    think we probably did some sketches on how

2    to build the space out, probably hand

3    sketches.  And he just followed that from

4    verbal direction.

5         Q.    So the drawings were not                    02:45:22P

6    revised?

7         A.    (Witness shakes head.)

8         Q.    Okay.  So there would be no

9    plans out there that would show --

10        A.    I don't think so.  I think our              02:45:28P

11   plans are for original building.  And I

12   think we pretty much just went and met

13   with the builder.  Said, "okay.  Let's put

14   walls here and here, and do it."  Some of

15   it was just naturally laid out, based on              02:45:44P

16   the way the plans were.  So it wasn't like

17   you had to create something out of

18   nothing.

19        Q.    Well, you were building within

20   a footprint, obviously?                                02:45:54P

21        A.    Right.  We just kind of fit it

22   in.  You know, her requirements was that

23   she wanted two bedrooms so she could have

24   people to come visit and stay with her

25   from time to time.  So, that kind of, in              02:46:02E

```
1     itself, dictated certain things.
2          Q.    Okay.  Had the slab already
3     been poured at the time that y'all --
4          A.    Yes.
5          Q.    Okay.  Were there any plumbing      02:46:18P
6     fixtures or --
7          A.    No.
8          Q.    -- plumbing stubbed out
9     anywhere?
10         A.    Not that I recall.                  02:46:24P
11         Q.    What did they have to do to
12    address that situation when it was decided
13    that y'all were going to add a kitchen and
14    bathrooms and --
15         A.    They saw cut where the plumbing     02:46:32P
16    would have to go, busted it out, laid the
17    plumbing in, and then connected it.  We
18    had to install a second septic system.  We
19    could have done that or put a pump in.
20    And we chose to just do the second septic      02:46:46P
21    system rather than pumping it back up to
22    the upper level.  Just because it'd be
23    less mechanical things --
24         Q.    Yeah.  I assume y'all are on a
25    septic tank out there?                         02:46:56P
```

1    if you could just read that for me,

2    I think that'd be the best way to do

3    that?

4         A.    14.

5         Q.    14(b).                                          02:49:34P

6         A.    "Whether such proceeds received

7    by you or your spouse were considered a

8    loan, a gift, or compensation.  Said

9    proceeds were not considered a loan, gift

10   or compensation but were received as part      02:49:50P

11   of the agreement for Margaret Martin to

12   reside in our household until she was

13   physically unable to do so."

14        Q.    Okay.  So you don't think it

15   was any one of those things, a loan, gift,      02:50:00P

16   or compensation?

17        A.    That what was one of those

18   things?

19        Q.    The 114 thousand dollars that

20   y'all obtained from Margaret?                   02:50:12P

21        A.    It wasn't a loan.  In some ways

22   it could be considered a gift or

23   compensation.  I'm not sure what the right

24   word for that agreement would be.

25        Q.    And you know, I was trying to

1      Q.    Okay.  Now, did you ever

2   provide any sort of accounting to

3   Margaret, concerning the use of those

4   funds?

5      A.    Say that again.                          02:52:56P

6      Q.    Did you ever provide a written

7   accounting to Margaret as to how those

8   funds were spent?

9      A.    No.

10     Q.    Okay.  And before we get off of      02:53:24P

11  that subject, that was one thing that I

12  had requested during Mrs. Myrick's

13  deposition, is any and all drawings or

14  blue prints, diagrams that were done.  You

15  know, any amended drawings or anything of    02:53:36P

16  that nature, sketches.

17           MR. GRAY:  I'll get you that.

18  Whatever we've got.

19           MR. SCHOEL:  Okay.

20           MR. GRAY:  Or what whatever we       02:53:48P

21  can find.

22           MR. SCHOEL:  The documents that

23  y'all produced, the construction file, did

24  that come from Tatum directly, or was that

25  just the Myrick's personal file?             02:53:52P

1    assemble, essentially, an accounting of

2    how those, the 114 thousand dollars was

3    spent?

4         A.    No.

5         Q.    So you can not positively                    02:58:36P

6    contend that it was only spent on

7    Margaret's living space; is that correct?

8         A.    All I can contend is, that we

9    had a cost-plus arrangement with the

10   builder, and we build out the downstairs      02:58:54P

11   according to Aunt Margaret's wishes.  And

12   that's what I can testify to.

13        Q.    When did you build the garage,

14   the detached garage at your residence?

15        A.    It was towards the end of the       02:59:20P

16   construction project.  Once we had framed

17   out all the space that she wanted to have,

18   which I think was about 22 hundred square

19   feet, there was very little left in the

20   basement.  And the further we got along       02:59:38P

21   with doing that work, the more apparent it

22   became that we really didn't have any

23   space to do anything, as far as storing

24   things, that we needed to store, outside

25   the living area.                               02:59:52

1      Q.    Yes, sir.

2      A.    And we had talked about that

3   some with her.  And so, she had said she'd

4   be willing to give us the money to build a

5   separate garage.  And we said we didn't          03:00:06P

6   think that would be appropriate.  But that

7   we would consider it a loan.  And so, at

8   that point in time, it probably would have

9   been late February, middle to late

10  February, probably.  And we got with a          03:00:20P

11  builder, and I think, got them to add a

12  garage.

13     Q.    Now there was already a garage

14  on the basement level anyway, wasn't

15  there?                                          03:00:36P

16     A.    Yes.  There was a single door

17  garage.

18     Q.    And was it segregated, was it

19  walled off and everything, from the rest

20  of the basement space?                          03:00:44P

21     A.    Uh-huh.

22     Q.    Okay.  Now how much did you

23  ultimately wind up borrowing from Margaret

24  to build that garage?

25     A.    It was between 86, 87 thousand          03:01:02P

1    dollars, I believe.

2        Q.    Okay.  And do you know how much

3    it actually wound up costing to build that

4    garage?

5        A.    Again, that was just part of          03:01:16P

6    the cost-plus agreement with the builder,

7    and would have been included in the total

8    billings that he billed us.

9        Q.    Now how was that 86 thousand

10   dollars obtained from Margaret?               03:01:34P

11       A.    I believe that she had two CDs

12   that had matured.  And I believe those

13   were the two CDs that she used, to front

14   that loan.

15       Q.    Okay.  Do you remember which        03:01:54P

16   financial institution --

17       A.    Huh-uh.

18       Q.    -- where these CDs were held?

19       A.    No.  I didn't have, little or

20   anything to do with any of that.             03:02:14P

21       Q.    Did she write you a check for

22   that 86 thousand dollars?

23       A.    I don't know.  I didn't handle

24   that.

25       Q.    You didn't deposit the funds?       03:02:32P

1     A.    I didn't, no.

2     Q.    Do you know for certain whether

3  that 86 thousand dollars was used solely

4  to fund the garage?

5     A.    Are you -- I mean, are you                    03:03:00P

6  asking, do I know if the 86 thousand

7  dollars was all to the expense of building

8  --

9     Q.    Yes, sir.  Used specifically

10  for the garage?                                       03:03:08P

11     A.    I don't know that.

12     Q.    Okay.  And your understanding

13  was that the 86 thousand dollars would be

14  considered a loan, correct?

15     A.    That's correct.                              03:03:24P

16     Q.    And again, what were the terms

17  of that loan agreement with Margaret?

18     A.    The terms were, that if she

19  ever needed those funds for living or her

20  health expenses, that then we would refund    03:03:44I

21  that money and pay that as she needed it.

22     Q.    Are there any documents

23  memorializing that agreement?

24     A.    Not that I'm aware of.

25     Q.    Do you know why that agreement          03:04:12

1      A.    That's right.

2      Q.    Okay.  Was it at that time when

3   your wife's Power of Attorney was revoked?

4      A.    I think that was probably about

5   the same time.  I think that might have                 03:25:04P

6   had to do with the documents that the bank

7   received.  It was my understanding that

8   they might have had a revocation, that

9   they had another Power of Attorney,

10  whatever that legal term is.  Just the       03:25:24P

11  uncertainty of not knowing.

12     Q.    Did you ever make any

13  expenditures for household furnishings

14  with any of Margaret's money?

15     A.    Not that I'm aware of.          03:25:58P

16     Q.    Did you purchase any of the

17  furnishings or appliances for her basement

18  living space?

19     A.    We purchased the -- some of the

20  -- we purchased a refrigerator -- is there   03:26:10P

21  a dishwasher down there?  The dishwasher

22  down there, as a part of that cost of the

23  home, cost of doing the additions that she

24  wanted done.

25     Q.    So those all came out of the     03:26:28P

(205) 251-4227 / FAX (205) 251-4224                    64

1          A.     Been part of the construction

2     cost.

3          Q.     And y'all are still in

4     possession of the refrigerator that was

5     purchased for the living space, correct?          03:28:06P

6          A.     That's correct.

7          Q.     Okay. And the other appliances

8     as well?

9          A.     I think there's just a

10    dishwasher. I believe she brought a                03:28:16P

11    microwave with her, that she had, when she

12    moved.

13         Q.     Do you know of any other

14    property that belongs to her that y'all

15    are still in possession of?                        03:28:32P

16         A.     I don't know of any property

17    that she owns.

18         Q.     Furniture, anything like that?

19         A.     No.

20         Q.     Now it's my understanding that     03:28:40P

21    y'all had been requested to return the

22    refrigerator to her; is that correct?

23         A.     That's correct.

24         Q.     Okay. And y'all have not

25    returned it?                                       03:28:54P

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

```
 1            A.     That's correct.

 2            Q.     And what's your reasoning for

 3    not returning it?

 4            A.     That was part of our original

 5    agreement for her living with us.  That         03:29:02P

 6    was not part of any other agreement.

 7            Q.     And my understanding is, that

 8    you have not repaid any of the money that

 9    you received from Margaret, either the 114

10    thousand dollars or the 86 thousand             03:29:24P

11    dollars; is that correct?

12            A.     That's correct.

13            Q.     Okay.  Is that Will still in

14    front of you, the 2003 Will?

15            A.     I think maybe.                    03:29:42P

16            MR. GRAY:   There it is.

17            Q.     Were you present at any

18    meetings between Margaret and her attorney

19    when this Will was drafted?

20            A.     No.                               03:30:10P

21            Q.     Was your wife present?

22            A.     Not that I'm aware of.

23            Q.     Referring back to paragraph (k)

24    on page three of the 2003 Will.  Was the

25    purpose of that clause, to make it clear        03:30:48P
```

```
1              Q.    She was there at your
2    invitation, though, wasn't she?
3              A.    No.   She was there at her
4    request and our agreement of that request,
5    to take care of her.                              03:52:22P
6              Q.    You didn't protest her coming
7    to live there, though, did you?
8              A.    Huh-uh.   No.
9              Q.    Okay.
10             MR. GRAY:   Thank you.                   03:52:34P
11             Q.    So you do believe that the
12   improvements to your home, being the
13   basement, the finished basement and the
14   garage, which are paid for with Margaret's
15   money, have added value to your home?            03:53:06P
16             A.    I think there's added value to
17   the home of things we did.
18             Q.    Okay.  But you haven't had an
19   appraisal done?
20             A.    No.                                03:53:16P
21             Q.    If you were to sell your house
22   today or tomorrow, or any time in the
23   future, would Margaret or her estate be
24   entitled to any of the profits from that
25   sale?                                             03:53:34P
```

1        A.    No.

2        Q.    Are you aware of any benefit

3   that Margaret is presently receiving from

4   those funds of hers, that were used in the

5   construction of your lake house?                      03:53:42P

6        A.    Say that again.

7        Q.    Are you aware of any benefit

8   that Margaret is presently receiving from

9   the expenditure of those funds?

10       A.    Based on the fact that she              03:53:58P

11  doesn't live there anymore, no.

12       Q.    And along those lines, are you

13  aware of any benefit that Margaret is

14  presently receiving from the improvements

15  to your lake house, that were paid for             03:54:18P

16  with her money?

17       A.    No.

18       Q.    Do you have any relationship

19  with Gladys Spivey?

20       A.    (Witness shakes head.)    None,        03:54:30P

21  other than I know what she looks like.

22       Q.    Okay.  You don't call her on a

23  any --

24       A.    I've never.

25       Q.    Okay.  Do you know Quinton            03:54:40P

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224

REPORTER'S CERTIFICATE

STATE OF ALABAMA    )
JEFFERSON COUNTY    )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing, to the best of my ability and understanding.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

_____
Lori E. Defnall

My Commission expires:
January 22, 2011

PLAINTIFF'S
EXHIBIT
15
W. Myrick

## IN THE CIRCUIT COURT OF CHILTON COUNTY, ALABAMA

MARGARET N. MARTIN,                )
                                   )
          Plaintiff,               )
                                   )
v.                                 )        Civil Action No.:  05-336-B
                                   )
WAYNE MYRICK and                   )
LYNN MYRICK,                       )
                                   )
          Defendants.              )

### DEFENDANT WAYNE MYRICK'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

COMES NOW the defendant Wayne Myrick and for answer to the plaintiff's interrogatories states as follows:

1.    Please identify yourself, giving your full name, residence, and business address.

**ANSWER:    D. Wayne Myrick**
          **60 County Road 1000**
          **Verbena, Alabama  36091**

2.    Are you presently employed?  If so, please state:

   (a)    The name, address, and telephone number of your place of employment;
   (b)    your job title or position; and
   (c)    the name and address of each bookkeeper, payroll clerk or other person who has custody of records of salaries, commissions, bonuses, allowances, expenses or any other sums of money paid to you by your present employer during the term of your employment.

**ANSWER: Yes**
          (a)    **MG&A, Inc.**
                 **Four Riverchase Ridge**
                 **Hoover, Alabama  35244**
          (b)    **Principle/owner**
          (c)    **Defendant objects to this interrogatory on the grounds that it seeks information that is irrelevant, immaterial, not reasonably calculated to lead to the discovery of admissible evidence or is otherwise outside the scope of discovery pursuant to Rule 26 of the Alabama Rules of Civil Procedure.**

1

3.    Are you compensated on a straight salary basis?  If so, please state:

    (a)    Your gross salary per hour, week, month or year; and
    (b)    the amount of your gross earnings for the calendar years of 2003, 2004, 2005.

**ANSWER:    Defendant objects to this interrogatory including subparts (a-b) on the grounds that it seeks information that is irrelevant, immaterial, not reasonably calculated to lead to the discovery of admissible evidence or is otherwise outside the scope of discovery pursuant to Rule 26 of the Alabama Rules of Civil Procedure.**

4.    Do you have an ownership interest in any business?  If so, for each business, please state:

    (a)    The name of the business;
    (b)    the address of the principal place of business or general office;
    (c)    the type of business conducted;
    (d)    the present value of your interest in the business, and its percentage of the total value of the business; and
    (e)    your office or position in the business.

**ANSWER:    Defendant objects to this interrogatory including subparts (a-e) on the grounds that it seeks information that is irrelevant, immaterial, not reasonably calculated to lead to the discovery of admissible evidence or is otherwise outside the scope of discovery pursuant to Rule 26 of the Alabama Rules of Civil Procedure.**

5.    Do you have an ownership interest in any real property?  If so, for each parcel of property, please state:

    (a)    The address and legal description of the property;
    (b)    the ownership of the property as stated in the documents of title, and the location of each such document; and
    (c)    the present value of your equity interest in the property.

**ANSWER:  Defendant objects to this interrogatory on the grounds that it seeks information which is irrelevant, immaterial, not reasonably calculated to lead to the discovery of admissible evidence and is otherwise outside the scope of discovery pursuant to Rule 26 of the Alabama Rules of Civil Procedure.  Without waiving said objection, defendant states as follows:**

    **(a)    He is a joint tenant in real property located at 60 County Road 1000, Verbena, Alabama 36091.**
    **(b)    Ownership in the property is titled in the name of Lynn and Wayne Myrick.**
    **(c)    Defendant objects to this interrogatory on the grounds that it seeks information which is immaterial, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence and is otherwise outside the scope of discovery pursuant to Rule 26 of the Alabama Rules of Civil Procedure.**

6.    Do you maintain any personal checking or savings accounts?  If so, for each, please state:

    (a)    The name under which the account is held;
    (b)    the name of the bank and branch holding the account;
    (c)    the account number; and
    (d)    the current balance of said account.

ANSWER:    Yes
    (a)    **Lynn and Wayne Myrick**
    (b)    **Colonial Bank**
    (c)    **8007904488**
    (d)    **Defendant objects to this interrogatory on the grounds that it seeks information which irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence and is otherwise outside the scope of discovery pursuant to Rule 26 of the Alabama Rules of Civil Procedure.**

7.    Have you personally prepared, or had prepared on your behalf, any financial statement within the last five (5) years?

**ANSWER:  Yes**

8.    What is your present net worth?  If you cannot state an exact amount, give your best judgment.

**ANSWER:    Defendant objects to this interrogatory on the grounds that it seeks information which is irrelevant, immaterial, not reasonably calculated to lead to the discovery of admissible evidence and is otherwise outside the scope of discovery permitted by Rule 26 of the Alabama Rules of Civil Procedure.**

9.    For the last five (5) years through the present, for all money you or your spouse has received from any source, whether compensation, dividend, loan or gift, please set forth for each monetary source:

    (a)    The amount received;
    (b)    the name and address of the entity from whom the money was received;
    (c)    whether the money received was compensation, dividend, loan or gift; and
    (d)    the identity of all documents concerning the money received and the present custodian of same.

**ANSWER:    Defendant objects to this interrogatory on the grounds that it is overly broad, vague, burdensome, it seeks information which is irrelevant, immaterial, not reasonably**

calculated to lead to the discovery of admissible evidence and is otherwise outside the scope of discovery permitted by Rule 26 of the Alabama Rules of Civil Procedure.

10.  At any time during the last five (5) years, did Plaintiff ever reside in any residence owned by you or your spouse? If so, please state or describe:

     (a)  any agreement between you and Plaintiff concerning such living arrangements, whether written or oral;

     (b)  whether Plaintiff paid any rent or other mode of compensation for such living arrangements; and

     (c)  the amount of any such rent paid.

ANSWER:  Yes

     (a)  Margaret Martin came to live with us after she was told by a doctor she should not live alone. It was at her request. The agreement was that Margaret would live with us until we could not take care of her because of any medical condition that would require constant care such as a nursing home or similar care. We made this agreement prior to knowing what specific funds would be available from the sale of her home.

     Margaret initially moved in with us at our Hoover house. We were constructing a house at Lake Mitchell. We had additional room upstairs however it was not suitable because she could not live on a second floor where she could not get outside without going up and down stairs. As such we agreed to build out the space in the basement for her. Margaret wanted two bedrooms so she could have guests. She also wanted access to the backyard without steps.

     When we were about 70% complete with the house we noticed that it would not have a large enough garage space so we decided to build a garage and do improvements in the backyard area. Margaret Martin offered to pay for this but we indicated that it should be a loan. The loan was to be repaid as she needed it for medical or living expense that she might have once her monies were exhausted. If she died prior to that time then the loan would have been considered paid.

     (b)  No

     (c)  Not applicable

11.  Please describe the living quarters inhabited by Plaintiff during the time she resided in any such residence. In your description, please include:

     (a)  The cost of constructing or renovating any such living quarters to accommodate Plaintiff;

     (b)  the name of the person(s) or firm(s) that engaged in any such construction or renovation; and

     (c)  a detailed description of the source(s) of any funds used in the construction or renovation of such living space.

**ANSWER:**   Initially Margaret Martin lived with us at our home in Hoover, Alabama. Subsequently she moved with us to the lake home located in Verbena.  The downstairs living area consisted of approximately 2200 feet with two bedrooms, two bathrooms, sitting area, a den and partial kitchen.

       (a)    Specific costs of constructing the living quarters were not kept.  The agreement was not for a specific cost associated with the build out of the space but simply that it would be built out for her to live in.  The home was built on a cost plus arrangement with the builder.

       ( b)    Tatum & Company
       (c)    See answer to (a) above

12.    Did you ever construct, or have constructed, a garage or other similar structure on the property described in your answer to number 12 above?  If so, please state or describe:

    (a)    The total cost of constructing said garage or other similar structure;
    (b)    the name of the person(s) or firm(s) that engaged in any such construction; and
    (c)    a detailed description of the source(s) of any funds used in the construction.

**ANSWER:**   Yes
       (a) through (c) see answer to #11 above.

13.    In reference to the aforementioned residence owned by you and where Plaintiff resided, please state or describe:

    (a)    The amount of any debt currently owed in relation to said residence, including all mortgage indebtedness or home equity loans;
    (b)    the most recent appraised value of said residence; and
    (c)    the name of the person or entity that performed the most recent appraisal.

**ANSWER:**   Defendant objects to this interrogatory on the grounds that it seeks information which is irrelevant, immaterial, not reasonably calculated to lead to the discovery of admissible evidence and is otherwise outside the scope of discovery permitted by Rule 26 of the Alabama Rules of Civil Procedure.

14.    Please state whether you or your spouse ever received any portion of the proceeds from the sale of any house formerly owned by Plaintiff.  If so, please state, identify or describe:

    (a)    The dollar amount(s) of any such proceeds received by you or your spouse;
    (b)    whether such proceeds received by you or your spouse were considered a loan, a gift, or compensation;
    (c)    the dates of receipt of the proceeds from the Plaintiff;
    (d)    the purpose for which said proceeds were used;
    (e)    whether you are still in possession of any of the proceeds;

    (f)    any account into which such proceeds were placed, including in your response the name and address of the bank and account number; and

    (g)    whether an accounting of the use of said proceeds was ever provided to Plaintiff.

**ANSWER:**    Yes

    (a)    **$114,484.62**

    (b)    **Said proceeds were not considered a loan, gift or compensation but were received as part of the agreement for Margaret Martin to reside in our household until she was physically unable to do so.**

    (c)    **Approximately April 1, 2003**

    (d)    **Said proceeds were used to construct the living area for Margaret Martin.**

    (e)    **No**

    (f)    **The proceeds were placed in the construction loan account at First Commercial Bank bearing account number 000-109-565-7.**

    (g)    **No**

15.    Did you or your spouse ever represent to Plaintiff that any of the monies received by you from the Plaintiff would be considered a "loan"? If so, please state or describe:

    (a)    The date of any such representations;

    (b)    the names of any witnesses who were present at the time such representations were made;

    (c)    the date by which such loan(s) was/were to be repaid to Plaintiff; and

    (d)    any documents or writings which memorialize such representations.

**ANSWER:**    **Yes, as to the monies used to construct the garage.**

    (a)    **The specific date is unknown**

    (b)    **I do not know of any specific witnesses who were present when it was discussed.**

    (c)    **Repayment of the loan was to be made at such time as Margaret Martin had exhausted other funds.**

    (d)    **None exists.**

16.    As to any monies received from the Plaintiff, please state or describe:

    (a)    All expenditures or purchases made with any such monies; and

    (b)    the dates of any such expenditures or purchases.

**ANSWER:**    (a)    **Specific expenditures or purchases made with said monies are impossible to identify. The monies were placed in a construction account at First Commercial Bank. Drafts were then made on the account as construction progressed.**

    (b)    **The dates of expenditures or purchases are unknown. As referenced above, the monies were placed in a construction account with First Commercial Bank and withdrawn as construction was completed.**

6

17.    Please state whether, prior to the time that you used any of Plaintiff's funds for any sort of construction or renovation of your residence, you considered whether that conduct would impose any potential hardship upon the Plaintiff.

**ANSWER:    Margaret Martin was aware of the agreement and approved of the same. Defendant does not believe it imposed any potential hardship on Margaret Martin.**

18.    If your answer to the preceding interrogatory is in the affirmative, please set forth whether you determined that any benefit you derived outweighed the risk of hardship to the Plaintiff.

**ANSWER:    Not applicable**

19.    Please describe all defenses you assert in response to the Plaintiff's allegations, other than those described in response to the preceding interrogatories, including:

(a)    The substance of each such defense; and
(b)    all facts which support each such defense.

**ANSWER:    Defendant objects to this interrogatory on the grounds it is overly broad, vague, burdensome and outside the scope o f discovery pursuant to Rule 26 of the Alabama Rules of Civil Procedure.    Without waiving said objection defendant would refer the plaintiff to its answer to the plaintiff's complaint.**

20.    If you expect to call any witnesses at trial, please provide:

(a)    The name and address of each such witness; and
(b)    the subject matter on which the witness is expected to testify.

**ANSWER:    At the present time, a decision has not been made as to the use of any expert witness.    In the event an expert witness is retained Rule 26 information will be provided pursuant to the court's order.**

21.    Please identify each person who provided any information, of whatever nature or description, relating to any of your answers to these interrogatories.

**ANSWER:    Lynn Myrick and Wayne Myrick.**

22.    Please state whether each answer to each interrogatory set forth herein accurately sets forth the sum total of all facts known to you relating to the subject matter of the interrogatory.

**ANSWER:    Defendant objects to this interrogatory on the basis it is overly broad, vague, burdensome and to the extent it is refers to the "sum total of all facts to you relating to the subject matter of this interrogatory." Defendant states that he made reasonable efforts to**

provide information of which he is personally knowledgeable and the facts that are reasonably available to her.

23. Please state whether, in compiling your answers to these interrogatories, you have made a reasonable and diligent effort to identify and provide not only those facts as are within your personal knowledge, but also those facts as are reasonably available to you.

**ANSWER:**   See answer to #22.

Wayne Myrick

**STATE OF ALABAMA**        )
**JEFFERSON COUNTY**        )

I, Suzanne Capps Sheets, a notary public in and for said county in said state, hereby certify that **Wayne Myrick**, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this date that, being informed of the contents thereof, he executed the same voluntarily.

Subscribed and sworn to before me this the 19th day of December, 2006.

[SEAL]

Notary Public in and for the
State of Alabama at Large

My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 8, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

James C. Gray III (GRA013)
Attorney for defendants Wayne and Lynn Myrick

OF COUNSEL:

LLOYD, GRAY & WHITEHEAD, P.C.
2301 Twentieth Place South, Suite 300
Birmingham, Alabama 35223
(205) 967-8822

8

## CERTIFICATE OF SERVICE

I hereby certify that I have this 21st day of December, 2006, served a copy of the foregoing, by mailing the same by United States mail, properly addressed and first class postage prepaid, to the following:

David D. Schoel
Natter & Fulmer, PC
3800 Colonnade Parkway
Suite 450
Birmingham, Alabama  35243

Michael B. Beers
Beers, Anderson, Jackson,
  Patty & Van Heest, PC
P.O. Box 1988
Montgomery, Alabama  36102-1988

OF COUNSEL

9



PLAINTIFF'S
EXHIBIT
16
W. Myrick

Wayne & Lynn Myrick
60 County Road 1000
Verbena, Al 36091

October 8, 2004

Ms. Vikki Hooker Fisher
108 Karten Lane
College Station, Texas 77845

Re: Margaret Martin

Ms. Fisher:

I am writing you in response to your letter of August 22, 2004. I was surprised to hear that you are acting as an agent for Aunt Margaret. I am not sure what that means however, In order to correct some of the information that you have communicate I will respond. First let me say that Lynn was very hurt over the way that Aunt Margaret went about leaving. Lynn and I have discussed how the change of living arrangements came about and are convinced that others who did not fully understand her situation influenced Aunt Margaret. Lynn has taken care of her for the last ten years and was very close to her. I will try to respond to your letter in the order you wrote it for clarity.

*First Topic*

When Aunt Margaret had a stroke in December 2002 Dr. Dobson suggested that she didn't need to live alone. Lynn talked to her about Fair Haven and so did some close friends, she did not want to live there. Tommy came that December when she got out of the hospital and stayed with her briefly. Later Paula came, Tommy told us that Paula was his back up and that she will get Margaret moved into Fair Haven. Lynn was called a few days later and asked to come over and talk about things. When she got there she could tell that Aunt Margaret was upset. They talked about what was best for her and what she wanted. Aunt Margaret ask if she could come and live with us and Lynn did say she could come; Lynn had always cared a great deal for Aunt Margaret and Uncle Bill. When they needed help they always called on Lynn to come, which she always did. Later that week Rob came to drive Aunt Margaret's car back to Texas because the doctor had suggested that she didn't need to drive any more. She was upset that Tommy and Paula took her car, she told Lynn and several others that if she couldn't drive she would sell the car but she didn't seem to have a say so. She was upset for months over her car. Her car was very nice and she could have sold it for probably $15,000 to $20,000. According to Aunt Margaret she had already given Tommy's family approximately $75,000 in monetary gifts between Tommy, Kim & Rob as a result of an inheritance from her Aunt who had recently died.

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224

REPORTER'S CERTIFICATE

STATE OF ALABAMA    )
JEFFERSON COUNTY    )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing, to the best of my ability and understanding.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

_____
Lori E. Defnall

My Commission expires:
January 22, 2011

301 Title Building/300 21st Street North
Birmingham, Alabama   35203

At this time Lynn asked me if Aunt Margaret could come to live with us and I agreed to this. We were building a new home on the lake where we were moving to and there was only one bedroom on the main level. I knew it would not be feasible for her to live upstairs and we were not planning on finishing the basement for someone to live in but rather leaving it open for storage and a work shop. Since the ground level was more appropriate for Aunt Margaret she wanted to have a place in the basement to live because of being able to get out side and also she would have a place for visitors and guest to stay as well. We were all thinking she would live there until her death or health required other arrangements. She agreed to pay for finishing out the basement with the understanding that she would give us the money from the sale of her house to do this and what ever she received would be what we would accept for finishing it out and allowing her to come and live with us until her health would no longer allow it. This ended up being $114,484.62.

This understanding is one that not only Margaret had but was communicated to Tommy as well as some of Aunt Margaret's other relatives and close friends. We also had her see an attorney to convey this agreement prior to doing anything. I wanted someone besides us to know what the understanding was and that Aunt Margaret was making this decision on her own without any influence. The Attorney was Shan Paden and you may contact him if you really wish to resolve this matter as you say fairly and equitably. He would not be the attorney that would represent us in the event that this becomes a dispute because I have a general liability policy on me personally that would defend me against any law suites that might be filed. I am telling you this so you want think that I can be influenced by the cost of any litigation in order to get more than what we have previously agreed to.

As we were building out the space we realized that we did not have any storage space as we had hoped for and started looking at where we could store our personal things since the basement was almost completely taken over by Aunt Margaret. After much thought and planning we realized that we needed to build a separate garage for our things. We originally thought the cost would be about $75,000. Because we were building our final home where we hoped our children would come to visit us in our old age we planned for that and we had spent all we could on the project without any money left to allow us to build the garage. Aunt Margaret said she could provide the money to do that and we agreed that the money would be a loan that would only be repaid in the event that all her other money was spent and that if she died any amount owed on the loan would be cancel or satisfied as paid in full. She was very determined that Paula would not get any of her money when she died. This is a well-established fact that most people close to Aunt Margaret are very much aware of. As we finished the space out and built the garage we ended up receiving under this agreement $86,469.07. We fully intend to honor our original agreement and repay the money, as she needs for living purposes. I know she had approximately $185,000 in her account when they were transferred to Tommy and Paula's control.

Your assertions that Lynn was responsible for closing out Aunt Margaret's C.D.'s, checking and savings accounts is wrong. Aunt Margaret made this decision. The only

way Tommy's name could have been removed from a C.D. was for it to mature or for Tommy to die. Margaret closed the account at Amsouth to open a checking account in Clanton so she could get a check cashed when she needed to. As far as we know, Aunt Margaret did not have a savings account. You are correct in that the only people that could access her new accounts were Aunt Margaret and Lynn and this was done at Aunt Margaret's request.

She wanted Lynn's name on her accounts so she could take care of here bills when she was not able to which was several times when she was sick or in the hospital.

The account that Margaret had a National Bank of Commerce was put into her checking account at Colonial Bank at her request prior to going to Texas because she wanted to make funeral arrangements when she returned from Texas. I really don't know why she wanted to do this and I don't think Lynn even asked her or tried to figure out why she wanted to do this. Aunt Margaret is very strong willed and determined about what she wants.

The circumstances surrounding Aunt Margaret's move to Texas are very puzzling. I don't believe that Aunt Margaret was aware of Tommy's illness prior to going out to Texas because of this last action she requested. She never communicated to us of his illness or to any other friends that we are aware of. I would like to know if you could tell me when Aunt Margaret found out about Tommy's illness and when Tommy knew about his illness. From what we know Tommy was seriously sick before Aunt Margaret went to Texas to visit.

The reason we withdrew the money from here checking account was that we were not sure what was going on because of the way we were notified of her decision to stay out there and live with Tommy & Paula. We were called by an employee of the bank to let us know she had received a call from Tommy and he said he was taking over all here accounts and faxed a new power of attorney and revoking the one that gave Lynn power of attorney. This was really not necessary because if she had told us she wanted to move out there to live with Tommy that would not have been any problem with us. We were just doing what Aunt Margaret wanted while she was with us.

When we found this information out. I ask Lynn to call Aunt Margaret and make sure she knew what she was doing. Aunt Margaret said she knew what she had done and she wanted to stay in Texas because she was enjoying the attention she was receiving from her grand children.

When we received the call Lynn called me and I ask her if Aunt Margaret owed her any money for anything, as it was normal for Lynn to pay for things and Aunt Margaret to reimburse her. She told me that she had given Aunt Margaret $500 for her trip to Texas and had purchased her medicines as well for $600. Lynn had done this with cash she had rather than making a special trip to the bank. I told Lynn to make sure we got that money repaid immediately from Aunt Margaret's account.

It seems odd thought that for her to say she is going to live out there with Tommy but she actually lives by herself against the recommendations of here Doctor. While she lived with us she required someone to be with here all the time. I would like to know why she is not living with Tommy and Paula. This would not only take care of her personally needs but would be less expensive on her to live I would think.

## Second Topic

The $5,000 you reference was paid to Lynn with complete knowledge of Aunt Margaret. While she was living with us we provided utilities, food, transportation, paid for meals out and many other expenses. Aunt Margaret used an unusual amount of utilities keeping her space extremely warm. Lynn discussed these cost with her and they agreed on $2,500 for the year as well as Aunt Margaret giving Lynn another $2,500 for taking care of here for the last year.

## Third Topic

We have no knowledge of a C.D. from Regions Bank. The agreement we had with Aunt Margaret was to finish the basement area for a place for her to live at her request. We did not want to finish the basement and had no plans for finishing it off but rather only the possibility of doing it when we built the house. The house was under design and construction when all this happened and we had to adjust our original plans to accommodate Aunt Margaret. Quite the contrary we now have a space that we have to heat and cool due to it being finished and are having additional cost that we do not want or need. We spent all we could on the house when it was built and don't have any additional money to put into the house. We were willing to honor our agreement and do not feel justified in doing anything regarding this issue. We were willing to allow her to live with us until her health required care beyond what we could provide personally or she could afford to pay professionals to stay with her prior to moving to a nursing home. This was clearly communicated and was discussed with Shan Paden her attorney prior to us agreeing to let her come to live with us. Again you may substantiate this with Mr. Paden.

## Finally

The refrigerator was a part of the cost of the work in Aunt Margaret's space and was paid for with the funds from the sale of her house that was agreed to be a part of allowing her to come and live with us.

Your closing comments have a threatening tone. I do not take to these type of tactics and after considering what you have said in your letter feel that much of what is stated is not from Aunt Margaret completely but is being influenced by others around her.

The only money that is owed to Aunt Margaret is the $86,469.07, which we will repay according to our agreement, as she is well aware of as well as others close to her. In order that we may support her with this money when needed I would like to have a

complete accounting of her expenses so we can plan ourselves when and if we will need to supplement her retirement income.

It seems odd that know one knew, not her stepdaughter, her closest friends or any others that she communicates with regularly that she was going to stay in Texas when she left for a two-week visit. It is also odd that she did not know that Tommy was seriously ill when she went to Texas, nor did anyone else close to her. It seems odd that she is not suppose to live by herself but in moving to Texas where she knows no one Is left to live in an apartment by herself and burdened with the expense of living there when her son and daughter-in-law knew she had a place to live with people who had taken care of her for 10 years. Lynn was always the one there when she was sick, lonely or just needed help with her life. Tommy and Paula never gave her any attention and everyone that knew her understands this fact.

Your letter tries to paint a picture that Lynn and I have done something wrong in this whole affair but that is just not correct. I suspect you are very much influenced by Paula in this matter rather than Aunt Margaret. Given all the above it is still our intention and desire to return the $86,469.07 to Aunt Margaret as her needs dictate and according to the agreement that Aunt Margaret was agreeable with. When we discussed this it was both Aunt Margaret and our intention that this money would be the last money she would have to live on if needed and we understood, as did others close to her that this was the understanding. We have spoken with all of those who she told this to and they have confirmed it as well. Shan Paden Discussed the sale of her house and the use of that money with Aunt Margaret and told her that she would not be able to get it back for any reason and she understood that. Shan Paden also in talking with her was able to evaluate her mental state of mind and determine she was able to make this decision on her own and that she knew what she was agreeing to at the time.

If you would have Aunt Margaret call Lynn then they can work out the how and when she will need this money. It will be better for everyone else to remove themselves from this issue and let Lynn and Aunt Margaret work together on this to address the money and also help heal the hurt that was done. We understand how difficult growing old can be and this was the primary reason for allowing Aunt Margaret to come and live with us. Our hope was that Aunt Margaret would have a higher quality of life than what she would have had in Fair Haven nursing home where Paula wanted to put her. I believe Lynn while hurt from all this still very much cares for Aunt Margaret and wants the very best for her as I do.

Sincerely,

Wayne Myrick



**FIRST COMMERCIAL BANK**
MEMBER FDIC
PO Box 11746 • Birmingham Al 35202

*Building acct*

**Statement of Account**

| | |
|---|---|
| Last statement: | **March 11, 2003** |
| This statement: | **April 09, 2003** |
| Total days in statement period: 29 | |
| 000-109-565-7    Bank 693    Page 1 of 1 | |

D WAYNE MYRICK
LYNN MYRICK
717 LAKE CREST DR
HOOVER AL 35226-5076

4

*Direct inquiries to:* 205 868-4954
RECEIVE A HOME EQUITY LINE OF CREDIT
WITH NO CLOSING COSTS WHEN YOU OPEN
A NEW RESPONSE ACCOUNT AT FIRST
COMMERCIAL BANK! CALL 868-4954 FOR
MORE INFORMATION.

## Summary of Account Balance

| Account | Number | Ending Balance |
|---|---|---|
| Signature Personal Checking | 000-109-565-7 | $165,614.8 |

## Signature Personal Checking

unt number
000-109-565-7

4 Enclosures

| | | | |
|---|---|---|---|
| Beginning balance | $191,894.73 | | |
| Low balance | $24,275.11 | | |
| Average balance | $55,555.93 | Avg collected balance | $55,878.0 |
| Total additions | $ 160,207.92 | Total subtractions | $ 186,487.8 |

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 111 | 03-12 | 167,619.62 | 113 | 04-08 | 2,759.4 |
| 112 | 04-03 | 5,385.83 | | | |

*from the sell of aunt Margaret House*

| Date | Description | Additions | Subtraction |
|---|---|---|---|
| 04-01 | #Deposit | 114,484.62 | |
| 04-04 | #Deposit | 45,723.30 | |
| 04-04 | Debit Memo | | -10,723.0 |



PLAINTIFF'S
EXHIBIT
17
W. Myrick

### Daily balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 03-11 | 191,894.73 | 04-01 | 138,759.73 | 04-04 | 168,374.2 |
| 03-12 | 24,275.11 | 04-03 | 133,373.90 | 04-08 | 165,614.8 |