# EXHIBIT

# A

Case 2:05-cv-00369-WKW-SC Document 144-2 Filed 12/13/2007 Page 2 of 3



# ATTORNEYS INSURANCE MUTUAL
## OF ALABAMA, INC.
### NEWSLETTER

Winter 1993 — A Mutual Insurance Company Organized by and for Alabama Attorneys — Vol III, No. 1

# Insurance Defense Practice and Murphy's Law

*"If It Can Go Wrong, It Will Go Wrong." Murphy's Law*

by Bert S. Nettles



*Bert S. Nettles is a partner in the Birmingham law firm of Spain, Gillon, Grooms, Blan & Nettles. He is one of the oldest defense attorneys for AIM and has extensive experience in defense against legal malpractice claims. He has been a lecturer and member of the planning committees for AIM's CLE Seminars. Mr. Nettles was president of the Alabama Defense Lawyers Association during 1987-1988.*

Recently there was a $500,000 jury verdict against an insurance defense lawyer here in Alabama. Allegedly he allowed a conflict to develop in his representation of an insured being defended under a reservation of rights. That result seems to be a natural progression of several recent decisions.

Rules of Professional Conduct 5.4(c) prohibits a lawyer employed by a party to represent a third party from allowing the employer to influence his or her professional judgment. The landmark case of **L & S Roofing v. St. Paul Fire & Marine**, 521 So. 2d 1298, 1303 (Ala. 1987), should be required reading for all attorneys retained by insurers to defend insureds under a reservation of rights. That case explains Rule 5.4(c) as applied to this situation and holds that counsel owe a duty of full and ongoing disclosure to the insured. Potential conflicts of interest between insurer and insured must be fully disclosed and resolved in favor of the insured. All information relevant to the insured's defense, including a realistic and periodic assessment of the insured's chances to win or lose the pending lawsuit, must be communicated to the insured. All offers of settlement must be disclosed to the insured as those offers are presented. Under a reservation-of-rights defense, it is the insured who may be called upon to pay any judgment or settlement. Therefore, it is the insured who often must make the ultimate choice regarding settlement. In order to make an informed decision in this regard, the insured must be fully apprised of all activity involving settlement offers or rejections coming from the injured party or the insurance company.

The first Alabama Supreme Court decision citing L & S Roofing was **Mitchum v. Hudgens**, 533 So. 2d 194 (Ala. 1988). The court held that an attorney who has been retained by an insurer to represent an insured should generally keep the insured apprised of all developments in the case, including any settlement negotiations. However, the attorney is not liable in malpractice for failing to inform the insured of settlement within policy limits where the insured has agreed in the policy to the insurer's exclusive right to enter into such settlements.

The Alabama Supreme Court greatly expanded L & S Roofing in **Shelby Steel Fabricators, Inc. v. U.S.F. & G. Ins. Co.**, 569 So. 2d 309 at 312 (Ala. 1990). There the insurer realized it did not have coverage after it had assumed the defense of the insured. The first issue decided by the Court

(Continued on page 2)

---

Throughout 1992 AIM was again able to operate efficiently and avoid a rate increase. Many insureds actually saw a decrease in their annual premium rates. Insureds who had maintained their AIM coverage for three continuous years received a renewal credit in 1992. This credit will continue in 1993.

AIM commenced operation in July 1989 with approximately $2,000,000 in assets. As shown on the balance sheet on page three, AIM's assets exceeded $5,500,000 in November 1992. AIM expects continued growth in 1993.

---

## Yes, AIM insures Sole Practitioners, Small & Large Firms!

Occasionally AIM is asked what types of attorneys it insures. The answer is: Sole practitioners, partnerships, professional corporations, small firms and large firms including those having 30+ attorneys.

If you are an Alabama attorney engaged in private practice, chances are you qualify for coverage. AIM can meet the needs of the vast majority of Alabama attorneys.

AIM was founded to bring stability to the legal malpractice insurance market in Alabama. Commercial insurers have often come and gone whimsically from the Alabama marketplace. Their willingness to insure different sizes and

(Continued on page 3)

# Insurance Defense Practice and Murphy's Law

*(Continued from page 1)*

> "Counsel owe a duty of full and ongoing disclosure to the insured."

was in the insurer's favor, holding that at least constructive notice had been given to Shelby Steel as to a reservation of rights. However, the Court then held as follows:

> Because Shelby Steel was not kept informed as to the status of its case between the initial notice of the reservation of rights (which we again note was minimal) and U.S.F. & G.'s denial of coverage 29 months later, we conclude, that U.S.F. & G. has failed to meet its enhanced obligation to Shelby Steel and, therefore, **that it must indemnify Shelby Steel for any liability in the underlying action.** (Emphasis supplied)

> "All information relevant to the insured's defense, including a realistic and periodic assessment of the insured's chances to win or lose the pending lawsuit, must be communicated to the insured."

Due to finding a breach of the "enhanced obligation", in effect coverage was created where none previously existed.

A further worrisome case is the 1990 decision in **American Employers Insurance Company v. Southern Seeding Services, Inc., et al.**, U.S. District Court for the Northern District of Alabama, CV 87-G-0294S. Judge Foy Guin allowed the defendant insured's counterclaim against the insurer alleging fraud and bad faith to go to the jury even though a summary judgment had been granted for the insurer holding there was no coverage under the policy. The insurer had earlier defended under a reservation of rights, and then denied coverage after a verdict had been returned against the insured in the underlying case. On February 22, 1990, the jury returned a verdict awarding $400,000 in compensatory damages and $750,000 in punitive damages. Judge Guin's jury charge stated there were eight alternative factors the jury could consider as to "whether the insurance company breached its duty of good faith and fair dealing by failing to settle the claim against its insured":

> "The attorney is not liable in malpractice for failing to inform the insured of settlement within policy limits where the insured has agreed in the policy to the insurer's exclusive right to enter into such settlements."

a. Failure to keep the insured fully informed;
b. Failure to inform the insured of "all settlement offers or potential";
c. Failure to solicit a settlement offer or initiate settlement negotiations when warranted under the circumstances;
d. Failure to compromise or settle when the facts of the case indicate obvious liability;
e. Rejection of a reasonable offer or potential for settlement within the policy limits;
f. Disregarding the advice of an adjuster or attorney handling the claim;
g. Failure to tell the insured of the likelihood of losing the case for an amount in excess of the settlement potential of the claim or suit; and
h. Placing the interests of the insurance company above those of the insured.

The retained defense counsel must always be guided by the realization that the insured is his client, not the insurance company who pays his bills and presumably utilizes his services on a regular basis. Some suggestions are as follows:

> "The retained defense counsel must always be guided by the realization that the insured is his client, not the insurance company who pays his bills."

1. An early understanding with the insurer and the insured as to what the retained defense counsel can and cannot do is generally helpful in all defenses under a reservation of rights and in potential excess situations;
2. Be careful as to what communications are made to the insurer. (Never send the insurer a blind copy of a letter to the insured);
3. Copy the insured with everything, including the correspondence and pleadings;
4. Report to both the insured and the insurer on a regular basis;
5. Periodically evaluate and re-evaluate settlement potential, and fully communicate such evaluations to both the insured and the insurer;
6. Keep your file fully open to the insured and the insured's separate attorney, but possibly not to the insurer;
7. Constantly be sensitive to possible conflicts, and resolve them in favor of the insured;
8. Re-read L & S Roofing often;
9. Realize that withdrawal may sometimes be necessary; and
10. Remember **Murphy's Law**.

### Does Your Letterhead Speak Well For Itself?

Law is a profession where a majority of work is done by, or accompanied with, correspondence. An attorney's letterhead is in constant use. What impression does yours convey? That is important when corresponding with clients, judges, opposing counsel and other parties. Many persons have not met you and know you only by the written product your office produces.

A professionally designed and printed letterhead conveys a positive message about your office. The recent availability of personal computers with graphics capabilities has led some attorneys to "print" letterhead with their laser printers. Unfortunately, a self-designed letterhead seldom achieves the professional appearance that the public has come to expect from a law office.

Use a commercial printer to produce your letterhead. A professionally printed letterhead gives a superior impression over one produced from a personal computer. Additionally, professional printing and use of special paper stock makes unauthorized duplication of your letterhead more difficult. Your law office is the result of a great investment of time and money. It deserves a letterhead reflecting that.